# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JAMES FOWLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:14-cv-00297-WTL-DKL |
| | ) | |
| ALEX JASTILLANO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## Entry Discussing Motion for Summary Judgment

Plaintiff James Fowler's claims in his Amended Complaint, as screened by the Court in the Entry of March 17, 2015, are that defendants Physician Assistant Alex Jastillano and Dr. William Wilson exhibited deliberate indifference to his serious medical need for treatment of back, neck, shoulder, and arm pain. Fowler's claims are brought pursuant to the theory recognized in *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971).

The defendants move for summary judgment on Fowler's claims and he has responded. For the following reasons, the motion for summary judgment [dkt 105] is **granted**.

## Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.").

However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490. Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

## Undisputed Facts

A. *Background of Fowler's Injuries and Pain*

Fowler was incarcerated at the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute") from September 1, 2011 to October 7, 2013. During this time, Fowler experienced pain in his back, neck, shoulder, and arm. He saw BOP physician Dr. Roger Jones at Chronic Care Clinic on September 15, 2011, shortly after he arrived at the prison. Dr. Jones noted that Fowler had a history of "low back pain for 20 years" and had been told that his lumbar discs "were crushed." Fowler also reported a compression fracture in his back from a diving accident, injuries from a gunshot wound to the throat, and injuries from a serious motor vehicle accident in 2008. Dr. Jones prescribed Gabapentin and Ibuprofen for Fowler's chronic pain and requested x-rays of Fowler's thoracic and lumbar spine.

The x-rays that Dr. Jones ordered were performed on September 21, 2011. Fowler's lumbar spine x-ray was "negative." His thoracic spine x-ray was abnormal and revealed: "[m]inimal

2

[degenerative disc disease]; mild age-indeterminate compression deformity . . . ; [and a] metallic BB in [the] right lower neck/upper chest . . . ."[1]

B. *Fowler's Early Interactions with PA Jastillano*

PA Jastillano examined Fowler for the first time a week after the x-rays, on September 28, 2011. PA Jastillano reviewed the September 21 x-rays, noted Fowler's history of back trauma, and placed requests for Fowler to see a neurosurgeon. PA Jastillano also updated Fowler's medical duty status to note that he was cleared for food service but restricted him from climbing, using ladders, and lifting more than 15 lbs. The next day, PA Jastillano made an administrative note that Fowler could not yet be referred to a neurosurgeon because Fowler first needed a CT of his thoracic spine. PA Jastillano therefore placed a request for Fowler to have a CT scan.

Fowler had a CT scan of his thoracic spine on November 21, 2011. Based on his continuing complaints of pain, Fowler had a cervical spine x-ray on February 9, 2012, which was "[n]egative except for moderate degenerative disc disease" and "narrowing of the neural foramina bilaterally at C5/6."[2] Fowler's lumbar spine x-ray was performed on February 15, 2012.

---

[1] The Court notes that the Statement of Material Facts Not in Dispute submitted by the defendants contains a number of quotations like this one which are replete with medical jargon for which no definition or explanation is provided. Such a presentation makes a clear understanding of the facts unnecessarily difficult. In reciting the facts here, the Court has attempted either to simplify the facts presented or find explanatory information for the medical jargon as background. The Court and the parties would be better served in the future if such simplification and explanation were provided by the parties.

[2] In other words, a narrowing of the openings along the spine through which the nerves pass. http://www.spine-health.com/glossary/neural-foraminal-stenosis

3

On February 10, 2012, PA Jastillano refilled Fowler's Acetaminophen and requested a CT scan of Fowler's cervical and thoracic spine. On February 28, 2012, Fowler had a CT scan of his cervical spine.

Fowler saw Dr. Jones at Chronic Care Clinic on March 6, 2012. Dr. Jones noted that the results from the February 28, CT scan were still pending but that Neurontin was not controlling Fowler's neck and back pain. Dr. Jones therefore added Elavil (Amitriptyline) and Naproxyn to address Fowler's neck and back pain. On March 14, 2012, in light of the CT scan results, Dr. Jones placed a request for Fowler to see a neurosurgeon.

C. *Fowler's Fall*

On April 1, 2012, Fowler slipped and fell while working in the USP Terre Haute kitchen. After the fall, Fowler was seen by RN Haddix who noted that Fowler had an abrasion on his right forearm and was complaining of "lower back pain, right elbow/arm pain, and posterior neck pain." Fowler reported that he had "chronic lower back pain and neck pain" and was "receiving Naproxin [sic], Neurontin, and Elavil." RN Haddix prescribed Acetaminophen and ice, gave Fowler a 2-day medical idle, and instructed Fowler to return to sick call in 12-24 hours.

D. *Neck Surgery*

On May 16, 2012, based on Dr. Jones's request, Fowler saw Dr. Pradeep Narotam, a neurosurgeon at Union Hospital in Terre Haute. Dr. Narotam noted that "[i]n 1998 [Fowler] dived into a river and sustained a T6 and T7 fracture." Fowler "complain[ed] of numbness in his hands for 10 years, worsening since June 2005," "weakness in [his] [upper extremities] for 5 years, with increasing hand numbness," and "chronic neck pain since 1998, worsening since 2007." Dr. Narotam diagnosed Fowler with nerve irritation in his neck and recommended surgery. Dr.

Narotam also recommended that Fowler receive "vicodin for pain management until surgery" and noted that Fowler "may need carpal tunnel release in addition to neck surgery."

On June 13, 2012, PA Jastillano reviewed Dr. Narotam's report from Fowler's May 16 appointment. PA Jastillano noted that the recommended surgery needed to be approved by the Regional Office and placed a formal request for the surgery. PA Jastillano also noted that Fowler needed to see a neurologist for a test known as an electromyogram/nerve conduction study ("EMG/NCS") of his upper extremities. PA Jastillano requested the neurology consultation, and indicated that Fowler may need carpal tunnel surgery.

On June 20, 2012, PA Jastillano saw Fowler. PA Jastillano noted that Dr. Narotam had recommended that Fowler be placed on narcotic pain medication while he was waiting for surgery. PA Jastillano therefore prescribed Percocet (Oxycodone/ Acetaminophen).

On August 6, 2012, Fowler was admitted to Union Hospital in Terre Haute for neck surgery. The surgery was performed on August 8, 2012, and Fowler was discharged back to the prison that same day.

Fowler had several physical therapy sessions in the months following his surgery. After these were completed, the physical therapist discharged him to his housing unit with no restrictions.

On October 11, 2012, Fowler had a cervical spine x-ray, apparently as a follow-up to surgery. The x-ray was "[n]egative except for moderate degenerative disc disease." An "[i]ntervallic anterior and interbody fusion at C5-6"[3] was visible and there was "[u]nchanged multilevel foraminal narrowing, most severe at C5-6."

---

[3] There is no elaboration in the record of what this means.

Fowler saw BOP physician Dr. Klint Stander at Chronic Care Clinic on October 16, 2012. Dr. Stander noted that Fowler's surgical scar was "well healed" and that Fowler had "[n]o arm pain or weakness." Dr. Stander reported that Fowler's neck was "stiff" and he "ha[d] difficulty turning to the left" but could "turn to the right ok." Fowler also complained of low back pain and some numbness in his left buttock, the back of his left leg, and the bottom of his left foot. Dr. Stander increased Fowler's Gabapentin to 2700 mg per day and noted that Fowler was scheduled for follow up with Dr. Narotam.

On November 14, 2012, Fowler had a three-month follow up appointment with Dr. Narotam about his neck surgery. Fowler "complain[ed] of neck pain and stiffness but no arm pain or weakness." Dr. Narotam recommended that Fowler apply heat to his neck, perform stretches or other activity to keep his muscles loose, and wean off his Neurontin. Dr. Narotam stated that Fowler should follow up as necessary but a return was not scheduled.

On January 1, 2013, Fowler saw PA Jastillano about left shoulder pain. PA Jastillano noted that the pain was "most likely . . . a refeered [sic] pain from his neck problem" and declined to increase Fowler's Gabapentin to 3600 mg per day because Fowler was already on a very high dose of Gabapentin and was also receiving other pain medications, including Ibuprofen.

E. *Elbow and Hand Pain*

In addition to his neck problems, Fowler was also treated during the relevant time period for elbow and hand pain. On September 25, 2012, Fowler saw LPN Dobbins at Sick Call complaining of right elbow pain. Fowler requested Ibuprofen for pain instead of Naproxen. LPN Dobbins prescribed Ibuprofen and scheduled Fowler to see PA Jastillano. Fowler saw PA Jastillano on September 27, 2012. Fowler complained of right elbow pain and again stated that the

6

Naprosyn was not helping his pain. Fowler requested Ibuprofen, which had already been prescribed and was waiting for him at the pharmacy.

On October 18, 2012, Fowler saw Dr. Doug McGuirk at the UAP Bone and Joint Center about his carpal tunnel syndrome and epicondylitis (tennis elbow). Fowler stated that "for the past few years he ha[d] had intermittent numbness and tingling in his right hand" and had right elbow pain for the past few months. Dr. McGuirk performed steroid injections into Fowler's right elbow and right carpal tunnel and ordered a wrist splint for Fowler. Dr. McGuirk did not recommend carpal tunnel surgery.

On November 16, 2012, PA Jastillano made an administrative note regarding Fowler's appointment with Dr. McGuirk. Because Dr. McGuirk had ordered follow up in "3-4 months," PA Jastillano placed a request for Fowler to see a hand surgeon.

On January 31, 2013, Fowler saw Dr. McGuirk regarding his right elbow and right carpal tunnel pain. Fowler stated that the steroid injections on October 18, helped for "a couple months" but he was still having right elbow pain and numbness and tingling in his right hand. Dr. McGuirk did another steroid injection of Fowler's right elbow, recommended right carpal tunnel release surgery, and prescribed Ultram to treat Fowler's elbow pain.

Upon his return to USP Terre Haute, Fowler saw LPN Sawyer. She noted the prescription for Ultram and contacted Dr. Wilson who determined that Ultram was not indicated and non-formulary. On February 28, 2013, PA Jastillano made an administrative note about Fowler's January 31 appointment with Dr. McGuirk. PA Jastillano noted that pain medication would be substituted as necessary for the Ultram that was prescribed by Dr. McGuirk and placed a request for Fowler to have hand surgery.

7

The next day, Fowler saw PA Jastillano at Chronic Care Clinic. Fowler complained of "back pain, elbow pains[,] and also hand pain (CTS),"[4] and requested an increase in his Gabapentin. PA Jastillano noted that Fowler was scheduled to have a CTS release and questioned whether Fowler truly needed an increase in his Gabapentin. However, PA Jastillano did ultimately increase Fowler's Gabapentin from 2700 mg per day to 3000 mg per day.

On April 10, 2013, Fowler saw BOP physician Dr. Joseph Bergeron at Chronic Care Clinic. Fowler stated that his neck surgery "neither helped or worsened his neck pain," and he complained of right elbow pain, which had not been helped by steroid injections. Dr. Bergeron ordered an x-ray of Fowler's right elbow, which was performed on April 12, 2013. The x-ray was negative.

On April 26, 2013, Fowler had right carpal tunnel release surgery and a steroid injection to his right elbow performed by Dr. McGuirk. Fowler saw EMT Webb upon his return to USP Terre Haute and was given Percocet (Oxycodone/Acetaminophen) to manage his post-operative pain.

Fowler saw Dr. McGuirk for a follow up appointment on May 7, 2013. Fowler reported that he had mild to moderate pain in his hand and wrist, as well as moderate pain in his elbow. Dr. McGuirk recommended surgery on Fowler's right elbow.

On May 28, 2013, Fowler saw BOP PA Timothy Tabor to follow up about his carpal tunnel surgery. PA Tabor noted that Dr. McGuirk had recommended additional surgery. Accordingly, PA Tabor placed a request for the recommended elbow surgery with appropriate follow up.

On June 10, 2013, Fowler saw LPN Dobbins at Sick Call complaining that his right thumb was "popping out of place." LPN Dobbins scheduled Fowler to see PA Jastillano. Fowler saw PA Jastillano on July 22, 2013, about his thumb pain. Fowler stated that the thumb pain developed

---

[4] The note "CTS" apparently refers to carpal tunnel syndrome.

after the hand surgery. PA Jastillano prescribed Prednisone and noted that narcotic medications were not indicated.

On August 2, 2013, Fowler had surgery on his right elbow and a right trigger thumb release[5] performed by Dr. McGuirk. Fowler saw RN May upon his return to USP Terre Haute. RN May updated PA Tabor on Fowler's post-operative condition and PA Tabor instructed RN May to give Fowler Percocet to manage his postoperative pain.

Fowler saw Dr. McGuirk on August 12, 2013, to follow up on his elbow and thumb surgery. Fowler was "doing very well" and had "minimal soreness in his lateral elbow . . . and slight soreness and swelling in his thumb." Dr. McGuirk noted that Fowler had "excellent early results following his procedures" and instructed Fowler to limit heavy activity with his right arm and to follow up in 6 weeks.

On October 7, 2013, Fowler was transferred from USP Terre Haute to FCI Beckley.

F. *Dr. Wilson*

Dr. Wilson is the Clinical Director of FCC Terre Haute. He treated Fowler on two occasions – August 8, 2012, and August 23, 2012. On August 8, 2012, based on PA Jastillano's note, Dr. Wilson made an administrative note indicating that Fowler would need a surgery follow-up in 90 days. He submitted a neurosurgery consultation request and a request for Fowler to undergo physical therapy. On August 23, 2012, based on Fowler's complaints of pain, Dr. Wilson changed Fowler's medications, suggested he use a neoprene elbow brace, and released him to light

---

[5] "Trigger finger . . . is a condition in which one of your fingers gets stuck in a bent position. Your finger may straighten with a snap — like a trigger being pulled and released." http://www.mayoclinic.org/diseases-conditions/trigger-finger/basics/definition/con-20043819 (last visited January 27, 2017).

9

duty work. He also submitted a request that Fowler see a hand surgeon "for consideration of carpal tunnel release." On January 31, 2013, Dr. Wilson noted that Ultram was non-formulary and not indicated. Fowler was directed to follow up as necessary.

G. *Review of the Fowler's Care*

Dr. Eric Potts, a Board Certified neurosurgeon employed by Goodman Campbell Brain & Spine in Indianapolis, Indiana, reviewed Fowler's medical records and opined that the medical care that Fowler received at FCC Terre Haute was timely, appropriate, and within the standard of care. Dr. Potts noted that Fowler was evaluated on multiple occasions, during which appropriate tests and consultations were ordered, performed, and reviewed. Moreover, Dr. Potts opined that Fowler's spinal problems preceded his April 1, 2012 fall. Thus, although the fall may have exacerbated Fowler's spinal problems, it neither caused nor created all of his neck complaints. Finally, Dr. Potts opined that he saw no reason for Fowler to have received a work restriction or medical idle prior to the April 1, 2012 fall.

Dr. Gregory Merrell, a hand surgeon at the Indiana Hand to Shoulder Center in Indianapolis, Indiana, reviewed Fowler's medical records and opined that the medical care provided to Fowler by BOP Health Services staff members was timely, appropriate, and within the standard of care. Like Dr. Potts, Dr. Merrell noted that Fowler's neck and back problems, which were associated with numbness, tingling, and weakness in his arms, all preceded his April 2012 fall. However, Dr. Merrell did not see any indication that Fowler had any significant functional musculoskeletal issues that would have limited his ability to work in the USP Terre Haute kitchen. Thus, Dr. Merrell did not see any reason for Fowler to be medically idled prior to his fall on April 1, 2012.

**Discussion**

Defendants Dr. Wilson and PA Jastillano seek summary judgment on Fowler's claims that they were deliberately indifferent to his serious medical needs, arguing that many of his claims are barred by the statute of limitations and that they provided him with timely and appropriate care.

A. *Statute of Limitations*

The defendants first argue that some of Fowler's claims should be dismissed as barred by the applicable statute of limitations. The statute of limitations in a *Bivens* action such as this one is two years. *See King v. One Unknown Federal Correctional Officer*, 201 F.3d 910, 913 (7th Cir. 2000). Fowler filed the Complaint in this action in Vigo Superior Court on September 15, 2014. Thus, the statute of limitations bars claims arising out of incidents that occurred before September 15, 2012.

Fowler resists this conclusion, arguing that the Court should apply equitable tolling to his claims because he was thwarted and delayed in his attempts to exhaust his available administrative remedies, a requirement before filing suit, and that defendant PA Jastillano acted deliberately in hiding his actions by refusing to order a CT scan that would have shown the full extent of Fowler's back problems.

Fowler initially appears to have argued that the statute of limitations on his claim under the Federal Tort Claims Act should be tolled. But the only claims in this case are Fowler's *Bivens* claims against PA Jastillano and Dr. Wilson. This does not include an FTCA claim against the United States. Fowler sought to amend his complaint in August of 2016 to add an FTCA claim against the United States, but this motion to amend was denied. Dkt. 98. Fowler has demonstrated no "manifest error of law" in this ruling. *See Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th

Cir. 2000). Further, in his proposed surreply, Fowler abandons any FTCA claim. Dkt 114-1 ("Plaintiff is asserting that any *Bivens* claims are equitably tolled . . . ."). Accordingly, it is not necessary to decide whether the statue of limitations is tolled for any FTCA claims.

Fowler also argues that the statute of limitations should be tolled for his *Bivens* claims. Equitable tolling permits a plaintiff to avoid the statute of limitations bar if, despite the exercise of all due diligence, he was unable to file his claim in a timely fashion. *Shropshear v. Corp. Counsel of the City of Chicago,* 275 F.3d 593, 595 (7th Cir. 2001). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo,* 544 U.S. 408, 418 (2005).

Fowler argues that the statute of limitations should be tolled from the time he started exhausting his administrative remedies and that PA Jastillano hid his injuries from him. Fowler also suggests that he was transferred several times during the relevant period which thwarted his ability to file this lawsuit. With regard to his first argument, he does not state when, other than in 2012, he started exhausting his administrative remedies. He also, notably, does not state when the administrative remedy process was complete. He could have filed suit any time after its completion and there is therefore no reason to toll the statute of limitations after the administrative remedy process is complete.[6] Moreover, this argument conflicts with Fowler's second argument – that Jastillano hid his back problems from him until he underwent a CT scan in 2016. Fowler fell in

---

[6] While it is true, as Fowler suggests, that in certain circumstances, the statute of limitations is tolled while administrative remedies are exhausted, those circumstances are based on the application of a tolling statute in Illinois for which there is no Indiana counterpart. *See Santiago v. Snyder,* 211 F. App'x 478, 480 (7th Cir. 2006).

April of 2012 and says he started exhausting his administrative remedies related to that fall in 2012. By his own admission, therefore, he was aware of his injuries and their possible cause in 2012. Finally, Fowler's argument that he was transferred between prisons is not an "extraordinary circumstance" that justifies the application of equitable tolling. *Denton v. United States*, 40 F. App'x 498, 502 (7th Cir. 2011). Fowler has thus not shown that he was pursuing his rights diligently and some extraordinary circumstance stood in his way.

In short, because he filed this action on September 15, 2014, any claim arising from actions that took place before September 15, 2012, is barred by the statute of limitations. Thus, the only claims that remain are based on one interaction with Dr. Wilson in October of 2012 and the interactions with PA Jastillano regarding the follow-up from Fowler's neck surgery and the treatment for Fowler's elbow and hand pain.

B. *Deliberate Indifference*

The defendants also argue that they were not deliberately indifferent to Fowler's medical needs. Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005) (quoting *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). *See Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

For purposes of summary judgment, the defendants appear to concede that Fowler's medical conditions were sufficiently serious to satisfy the Eighth Amendment test. They argue, however, that they were not deliberately indifferent to those conditions.

    1. <u>Dr. Wilson</u>

Dr. Wilson argues that he cannot be held liable for Fowler's claims because he only treated Fowler on two occasions – August 8, 2012, and August 23, 2012. The record also reflects that Dr. Wilson reviewed a request for Ultram, a non-formulary medication for Fowler's pain on January 31, 2013. Dr. Wilson denied that request because the medication was non-formulary but Fowler was instructed to follow-up as necessary. Dr. Wilson argues that the care provided on those occasions – submitting consultation requests, adjusting Fowler's medications, instructing him to obtain an elbow brace, and releasing him to light duty work does not amount to deliberate indifference. Dr. Wilson points out that as Clinical Director of FCC Terre Haute he cannot be held responsible for actions of his subordinates, but only for acts he participated in. *See Arnett v. Webster,* 658 F.3d 742, 758 (7th Cir. 2011). Fowler does not respond to this argument and appears to concede that Dr. Wilson's acts were not deliberately indifferent. A review of the record regarding Dr. Wilson's treatment of Fowler reveals that Dr. Wilson considered Fowler's complaints and provided adequate care. There is no evidence that Dr. Wilson was deliberately indifferent to Fowler's needs. He is therefore entitled to summary judgment on Fowler's claims.

### 2. PA Jastillano

PA Jastillano also argues that he was not deliberately indifferent to Fowler's needs. PA Jastillano argues that Fowler received care that was timely, appropriate, and within the standard of care.

Because earlier claims are barred by the statute of limitations, Fowler's claims against PA Jastillano must be based on care provided after September 15, 2012. During this time period, Fowler received post-operative care for his neck surgery and underwent carpal tunnel surgery and elbow and thumb surgery. He saw a number of doctors, including outside doctors. PA Jastillano

examined Fowler for his complaints of pain and considered his requests for additional pain medication. He referred Fowler to outside specialists and complied with their recommendations. The medical records establish that the care provided to Fowler was attentive and thorough. There is no evidence in this record that would support an inference that PA Jastillano was deliberately indifferent to Fowler's needs. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (explaining the circumstances in which deliberate indifference can be inferred). Further, PA Jastillano has submitted expert testimony that the care Fowler received was medically appropriate, timely, and within the standard of care. Fowler challenges this testimony, arguing that these conclusions are contradicted by his medical records and that his condition qualified as a disability under the Social Security Administration's regulations. But Fowler's mere disagreement with the proper course of treatment for him is not enough to show deliberate indifference. *See Pyles*, 771 F.3d at 409.

Fowler also argues that PA Jastillano was deliberately indifferent to him in treating him for an unrelated condition involving an infection of his scrotum. Fowler suggests that PA Jastillano's behavior toward him during this treatment demonstrates a pattern of deliberate indifference. But this condition is not part of a claim in this case and PA Jastillano's treatment of him for that condition is not relevant to show whether or not he was deliberately indifferent to the medical needs at issue in this case.

In short, an examination of the care Fowler received for the conditions that are at issue in this case does not support a conclusion that PA Jastillano was deliberately indifferent to his needs. Further, Drs. Potts and Merrell opined that there was no negligence. In the absence of negligence, there can be no deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Arnett v. Webster*, 658 F.3d 742, 758 (7th Cir. 2011) (stating that deliberate indifference is not medical

malpractice and that the Eighth Amendment does not codify common law torts); *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *Sanville v. McCaughtry*, 266 F.3d 724, 735 (7th Cir. 2001) (explaining that negligence does not state an Eighth Amendment claim); *Holmes v. Sheahan*, 930 F.2d 1196, 1200 (7th Cir. 1991) (citation omitted) (stating that a plaintiff "must demonstrate more than mere negligence on the part of government personnel in the diagnosis or treatment of a medical condition: a complaint alleging no more than 'an inadvertent failure to provide adequate medical care' does not state a valid claim of medical mistreatment under *Estelle*"). PA Jastillano is therefore entitled to summary judgment on Fowler's deliberate indifference claims.[7]

## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment [dkt 105] is **granted**. The motion to file a surreply [dkt 114] is **granted** to the extent the Court considered the arguments made in the proposed surreply. Judgment consistent with this Entry shall now issue.

---

[7] In his response to the motion for summary judgment, Fowler again challenges the Court's ruling allowing recruited counsel to withdraw their appearances on his behalf, but Fowler still fails to show that there was any error in this ruling. As the Court explained in detail in its rulings granting the motion to withdraw filed by Fowler's counsel and denying Fowler's motion for reconsideration on this issue, Fowler had able counsel recruited by the Court to represent him in this matter on a pro bono basis. It bears noting that recruited counsel, John Maley, is highly regarded in Indianapolis and has successfully represented pro se prisoners in previous cases in this Court. *See, e.g.*, *Kadamovas v. Lockett*, 2:11-cv-15-WTL-DKL; *Gabaldon v. Lilly et al.*, 2:10-cv-149-WTL-WGH. The record reflects that recruited counsel consulted an orthopedic surgeon to provide an opinion regarding the medical care that Fowler received. Dkt. 86-2. Based on a review of the medical records, the surgeon concluded that he or she could not opine that there were any breaches in the standard of care. Dkt. 86-2. After learning this, Fowler then "relieved [counsel] from representation." Dkt. 98. Counsel was thus permitted to withdraw. Dkt. 87. The Court further declined to seek new counsel to represent Fowler, explaining: "There simply are not enough attorneys willing and able to volunteer their time on a pro bono basis to permit a litigant to seek new counsel whenever counsel provides the litigant advice with which he disagrees." Dkt. 87.

**IT IS SO ORDERED.**

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Date: 2/2/17

Distribution:

JAMES FOWLER
23654-058
FCI Petersburg Medium
P.O. Box 1000
Petersburg, VA 23804

All electronically registered counsel